**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| LESTER S. BARNEY, | : |
| : | Civil Action No. 15-0057 (NLH) |
| Petitioner, | : |
| : |  |
| v. | : **OPINION** |
| : |  |
| STEVEN E. D'ILLIO, *et al.*, | : |
| : |  |
| Respondents. | : |
| : |  |

**HILLMAN, DISTRICT JUDGE**

Before this Court is the Petition for a writ of habeas corpus of Petitioner Lester Barney ("Petitioner"), brought pursuant to 28 U.S.C. § 2254. ECF No. 1. Following an order to answer, Respondents filed a response to the petition, ECF No. 5, and Petitioner filed a reply brief. ECF No. 13. For the following reasons, the Court will deny the Petition, but will grant a certificate of appealability.

**I.  BACKGROUND**

In an unreported opinion affirming defendant's conviction and sentence, the New Jersey Superior Court, Appellate Division, on direct appeal, provided the following summary of the factual background of Petitioner's trial:

> Following a seven-day trial, a jury found
> defendant guilty of both purposeful or
> knowing murder [of his wife] and
> interference with custody.

1

. . .

Defendant killed his wife Alla in the late afternoon of September 29, 2003, following a court appearance in which Alla obtained a final domestic violence restraining order against him. That order enjoined defendant from having any contact with Alla. In addition, it awarded temporary custody of their child, Danny, to Alla but allowed defendant parenting time.

Around 5 p.m., defendant went to visit with Danny at his daycare facility in Mount Laurel. Defendant regularly went to the daycare facility for this purpose but he would leave before Alla arrived to pick up Danny.

Defendant parked his car at the adjacent church parking lot and walked to the playground to play with Danny. After playing with Danny for about twenty minutes, defendant went inside to talk with the daycare facility's director, Virginia Eberling. Defendant told Eberling he had lost custody of Danny and then abruptly left when his cell phone rang.

At approximately 5:40 p.m., Alla arrived to pick up Danny and parked in the daycare parking lot. Upon entering the daycare center, Alla asked Eberling about a bag of Danny's clothes but Eberling did not know where the clothes were. Alla left with Danny at approximately 5:45 p.m.

Although defendant left the daycare center before Alla arrived, numerous witnesses testified that they saw defendant or his car in the area around the time Alla picked up Danny. For example, Jamie Brooks, an assistant teacher, testified that she saw defendant talking on the telephone and

pacing back and forth on the sidewalk near the day care facility around the time of Alla's arrival, and Danny's teacher, Christina Vorres, testified that she observed defendant in his car driving back to the daycare center while Alla was there.

Eberling testified that she left the daycare center around 6:05 p.m. As she was leaving the parking lot, she noticed that Alla's car was still there. This made Eberling "uneasy," so she stopped her car, got out and walked over to Alla's car. She peeked in the window and saw Alla lying inside the car with a long red hole in her neck and a slice across her throat. Eberling screamed, ran back to her car and drove to the police station where she reported Alla's apparent death. The police responded to the scene and found Alla's dead body in the car.

Around 7 p.m., defendant called Judith Hanney and told her he wanted to come to her home and "talk to [her] about something."

. . .

Defendant arrived at the Hanney home with Danny around 8 p.m. Shortly thereafter, defendant told Judith that "he did a dumb thing today." When Judith asked what he meant, defendant said that he went to the daycare center to talk to Alla, that they got into an argument, and that "there was a knife." Defendant also said that he "grabbed [Alla] by the wrists and [he] cut her[.]" . . . At this point, Judith's husband Tom came home, and she told him what defendant had said about inflicting a knife wound upon his wife.

Tom then spoke to defendant while Judith sat with Danny. According to Tom, defendant gave him the following account of the murder:

Q.   Did he say what happened when he went to the daycare center?

A.   He said that he waited for Alla outside and when she came out he and she sat in her car, I believe it was, and that he was trying to talk to her and then kind of in a rush he said there was, you know, an argument and a struggle and there was a knife and they struggled with the knife and basically he said ["] I cut her["] and he made this motion.

. . .

At trial, defendant took the stand in his own defense and presented a version of the killing of his wife that could have supported a defense of self-defense or accident.  According to defendant, he stayed at the daycare facility because he had Danny's shopping bag of clothing and wanted to give it to Alla.  He also hoped to persuade her to allow him to take Danny to his home for the night.  He approached Alla's car with the bag of clothing and asked if he could take Danny for the night.

Defendant gave the following version of what occurred next:

She turned around and looked at me and gave me a rather disgusted and nasty look and said ["]fuck you["] and then she turned around and reached into her car and I thought she was going to call and use her cell phone so I came over to her, said ["]please don't.["]  I didn't want her to call the police right away.  She turned around and she had a steak knife in her left hand and as she wield[ed] around in

front of me, she cut the nail off my left hand but I grabbed her hand, her left hand with my right hand and yelled ["]what the hell are you doing?["] And we struggled for a moment. She grabbed the knife with her right hand and the knife was losing -- the knife was moving because we were struggling and I know that's how she cut her finger on her right hand. At this point I'm saying stop it and she raised her right knee I think to probably knee me in the groin and we both fell backwards into the car. The knife was in both of our hands and I tried to turn so my back was to Daniel, then the knife went right into her throat. It was an accident. And there was pulsing blood everywhere. I got back out and I grabbed Daniel and I put him into my car and I went back to holler and shouted her name and looked at her and it was clear that the wound was mortal and I took her hand and I just cried and I backed up, shut the door to the car and I went back to my car. The only thing I was thinking [was that] I had to get Daniel away, get him to safety. I did some not so smart things at that point but I wasn't thinking rationally. I'd just seen the most horrible thing in my life. You saw the images. If you saw it when I saw it, it was even terrible. I'm sorry.

Defendant then left the scene with Danny without calling for help and threw the knife used to inflict the fatal wounds upon Alla out the window of his car.

On cross-examination, defendant initially claimed he had inflicted only a single knife wound upon Alla during their struggle. However, after being confronted with photographs and the medical examiner's testimony that he had cut not only both of Alla's jugular veins and both of her carotid arteries but also her chin and jaw down to the bone, defendant claimed the knife had also "caught her chin."

Based on this evidence, the jury found defendant guilty of murder and interference with custody.

ECF No. 5-16 at 2-8.

Petitioner appealed his conviction and sentence. The Appellate Division affirmed on October 18, 2007, ECF No. 5-16, and the New Jersey Supreme Court denied certification on February 29, 2008. ECF No. 5-17. Petitioner then filed a petition for post-conviction relief ("PCR") which was denied in a letter opinion on July 29, 2010. ECF No. 5-38. Petitioner appealed the denial of PCR, and the Superior Court of New Jersey, Appellate Division, affirmed the denial on April 27, 2012. ECF No. 5-53. Petitioner then appealed to the New Jersey Supreme Court, and on May 3, 2013, the New Jersey Supreme Court remanded to the PCR court for an evidentiary hearing on whether Petitioner asserted his right to proceed *pro se* and the New Jersey Supreme Court retained jurisdiction on the matter. ECF No. 5-54. The PCR court

held an evidentiary hearing on August 22, 2013.  ECF No. 5-75.  In an opinion on October 24, 2013 ("Remand Opinion"), the Superior Court, Law Division, concluded that Petitioner did not make a clear and unequivocal request to proceed *pro se*.  ECF No. 5-55.  Petitioner appealed and the New Jersey Supreme Court denied certification on April 3, 2014.  ECF No. 5-58.  Petitioner then filed a habeas petition with this Court which was executed on December 31, 2014.  ECF No. 1.  Petitioner raises seven grounds for habeas relief in the instant Petition:

1. In spite of defendant's clear and unequivocal request to proceed *pro se*, the court failed to hold a *Faretta* hearing thereby denying defendant his right to counsel guaranteed by the Fourth, Sixth and Fourteenth Amendments to the United States Constitution.  The appropriate re[m]edy for such a violation is a new trial.

2. The defendant was denied his right to the effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution when counsel failed to investigate and put forth a blood splatter expert.

3. The trial court committed reversible error when, in lieu of an official readback, allowed the jury to have a copy of the entire testimony of Defendant Barney.

4. The trial court committed reversible error when, the court failed to give a jury instruction of causation and/or failed to mold the jury instructions to the[sic].

5. The trial court committ[e]d revers[i]ble error when it provided the jury with an improper instruction on inference, which removed material elements from t[he] jury, denying defendant his right to a fair trial and due process of law, guaranteed by the Sixth and Fourteenth

Amendments of the United States Constitution.

6. The trial court committ[e]d revers[i]ble error when it allowed the state to introduce in its case in chief evidence of a final restraining order, denying defendant his right to a fair trial and due process of law, guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution.

7. The defendant was denied his right to the effective assistance of trial, appellate, and first post-conviction counsels guaranteed by the Sixth Amendment of the United [S]tates constitution when counsels failed to investigate and raise the issues contained in g[r]ounds one through six of this petition.

ECF No. 1 at 12-24.

Respondents filed an answer to the habeas petition arguing that Petitioner's claims are meritless. ECF No. 5.

## II.   <u>LEGAL STANDARD</u>

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court.  See <u>Eley v. Erickson</u>, 712 F.3d 837, 846 (3d Cir. 2013); <u>see also</u> <u>Parker v. Matthews</u>, 567 U.S. 37, 40-41 (2012).  Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act,

28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. See Renico v. Lett, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. See Woods v. Donald, 135 S. Ct. 1372, 1376 (2015).

A state court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529

U.S. 362, 413 (2000). A state court decision is an
"unreasonable application" of federal law if the state court
"identifies the correct governing legal principle," but
"unreasonably applies that principle to the facts of the
prisoner's case." Id. Habeas relief may not be granted on the
basis that the state court applied clearly established law
incorrectly; rather, the inquiry is "whether the state court's
application of clearly established federal law was objectively
unreasonable." Id. at 409-10. A rule's unreasonable
application corresponds to the specificity of the rule itself:
"[t]he more general the rule, the more leeway courts have in
reaching outcomes in case-by-case determinations." Harrington
v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks
and citation omitted). "A state court's determination that a
claim lacks merit precludes federal habeas relief so long as
fairminded jurists could disagree on the correctness of the
state court's decision." Id. (internal quotation marks
omitted).

Where a petitioner challenges an allegedly erroneous
factual determination of the state courts, "a determination of a
factual issue made by a State court shall be presumed to be
correct [and the] applicant shall have the burden of rebutting
the presumption of correctness by clear and convincing

evidence."  28 U.S.C. § 2254(e)(1).

## III. **DISCUSSION**

### A. **Ground One: Proceeding *Pro Se***

In his first ground for habeas relief, Petitioner argues that he was denied his constitutional right to proceed *pro se*.  ECF No. 1 at 12.  Petitioner raised this primarily as a direct claim on PCR, but also mentioned it in the context of ineffective assistance of counsel.  ECF No. 5-23 at 2-5.  The trial court denied PCR and Petitioner appealed, raising this argument as a direct claim, while at the same time raising a general claim of ineffective assistance of counsel.  ECF No. 5-49 at 20-30, 46.  The appellate court affirmed the denial of PCR and Petitioner appealed to the New Jersey Supreme Court, which remanded to the PCR court for an evidentiary hearing to make a finding of whether "defendant clearly and unequivocally made a request to the trial court to represent himself or whether defendant communicated with his attorney to make such a request on his behalf."  ECF No. 5-54.  The PCR court held an evidentiary hearing and the judge concluded that Petitioner did not make "a clear and unequivocal request to proceed *pro se*".  ECF No. 5-55 at 5.  The New Jersey Supreme Court denied certification.  ECF No. 5-58.  In Ground Seven of the instant petition, Petitioner argues that his

trial, appellate and PCR counsels were ineffective for all the reasons stated in Grounds One through Six. ECF No. 1 at 24. Thus, Petitioner appears to raise this claim in the context of ineffective assistance of counsel, in addition to raising it as a direct claim. The Court will first address the direct claim, and will then address the ineffective assistance of counsel claim.

The Superior Court of New Jersey, Law Division, on remand from the New Jersey Supreme Court, which represents the last reasoned decision on this matter, found that "the defendant did not clearly and unequivocally make a request to the trial court to represent himself and the defendant's communication with his attorney to make such a request on his behalf was not clearly and unequivocally made." ECF No. 5-55 at 3 (capitalized in original.) The court further explained:

> In State v. Harris, 384 N.J. Super. 29, 57 (App. Div. 2006), the Appellate Division stated "It is clear that pursuant to the Sixth Amendment a defendant can represent himself in criminal proceedings." (Citing State v. Gallagher, 274 N.J. Super 285, 294, 644 A.2d 103 (App. Div. 1994). The Appellate Division in Harris held that "The right to self-representation, however, is not absolute. A defendant must "'voluntarily and intelligently' elect to conduct his own defense." In order for a defendant to proceed pro se the request must be made "clearly and unequivocally". Id. at 57. This request must be made in a timely manner. Id. "It is only

12

after a party clearly and unequivocally asserts his or her right to proceed pro se and renounces the right to counsel that the court undertakes an investigation, the goal to determine the adequacy of the waiver." Id. at 58.

In the present case, jury selection began for the defendant on August 11, 2005. This trial was held before the Honorable John A. Almeida J.S.C. Before jury selection began Judge Almeida notified defense counsel that he had received another letter from the defendant Lester Barney. The letter was dated for July 21, 2005 but was marked receivd by Judge Almeida's Chambers for August 10, 2005. In the letter the defendant makes a request to represent himself Pro-Se. This letter, according to Judge Almeidas' Chambers, was received 1 day before trial was set to begin for the defendant.

During the evidentiary hearing the defendant was unable to convince this Court that the letter dated July 21, 2005 but stamped received August 10, 2005 was a clear and unequivocal request by the defendant to proceed pro se. Therefore, based on the findings in Harris this defendant did not clearly and unequivocally assert his right to proceed pro-se. The defendant merely mentioned wanting to proceed pro-se in a letter where he also discusses his dissatisfaction with his attorney as it related to receiving discovery. In Harris, the Appellate Division made it clear that the right to counsel is in force until waived. Id. at 58. There is no evidence that was presented to this Court during the Evidentiary Hearing that this right to counsel was waived by the defendant. As required in Harris, the request to proceed pro se must be in a timely manner. In this present case the letter was not received until one day before jury selection. The defendant failed to offer any

excuse or even offered a valid basis to disrupt his trial which was already in progress.

Although defense counsel argued, that Judge Almeida was dismissive of the July 21, 2005 letter, this should not discount the weight of the defendant's request, however, it still does not address the fact that the letter does not only reference his desire to proceed pro-se. In the first two paragraphs the defendant does mention he is interested in proceeding pro-se, but [] overall the tone and the length of the letter was to inform the Judge of his dissatisfaction with his attorney. The Appellate Division, in <u>Harris</u>, held ".... the court was under no obligation to affirmatively suggest the option or hold a hearing into the voluntary and knowing character of a waiver never even expressed." <u>Id.</u> at 60.

CONCLUSION

Based on the testimony presented at the evidentiary hearing this Court does not find that the defendant made a clear and unequivocal request to proceed pro-se.

ECF No. 5-55 at 3-5.

In the instant Petition, Petitioner states that on July 14, 2005, he informed his trial counsel of his desire to proceed *pro se*, and counsel advised him that he would receive a <u>Faretta</u> hearing. ECF No. 1 at 12. After a week without a hearing, he states that he wrote a letter to the court on July 21, 2005, advising the court of his desire to proceed *pro se*. <u>Id.</u> at 12, 19. In the appendix in support of Petitioner's *pro se* supplemental brief to the Appellate Division in appealing the

denial of PCR, Petitioner provided a copy of the July 21st letter ("Letter"), which forms the basis of the state court's Remand Opinion. The Letter, dated Thursday, July 21, 2005, and stamped by the chambers of John A. Almeida, J.S.C., on August 10, 2005, states:

> Honorable Judge John A. Almeida,
>
> At my hearing on July 14, 2005, I informed the court that if I had to choose between receiving & reviewing my discovery and having my pool attorney, I'll choose the discovery. The court instructed the pool attorney to at least provide the defendant with the Grand Jury minutes. As of this writing, July 21, 2005 (7:18pm) the grand jury minutes have not been received.
>
> On July 14th 2005, after my hearing, I informed my pool attorney that I will proceed on a PRO-SE basis. The pool attorney told me he would inform the court and that a hearing would be scheduled early the following week. Since it's now Thursday, July 21, 2005 and no hearing has been held, I'm not sure the court is aware that the defendant will go forward PRO-SE. This letter is to inform you of that fact.
>
> Acting now PRO-SE, I again move this honorable court for an order of discovery, first presented on September 20, 2004. The discovery motion is offered under Rule R 3:13 and R. 3:3-6[.]
>
> In addition, the defendant again brings to the courts attention, the issues stated in the letter to the court dated July 7th 2005, repeated here.
>
> 1. Acts to frustrate or impede defendants

rights to discovery.

On September 20th 2004, I submitted a motion for complete discovery. On Novem[]. . . I brought this and other issues to the courts attentio[n] . . . I requested confirmation from the court that the aforementioned motions had been[] upon. In each case the courts only action was to forward my motion and correspondence to the pool attorney who in turn has refused to place the motions before the court. Consequently, no order for discovery yet exists. This cycle has repeated itself to the point that the defendant has been denied his right to the ac[cess] of the court.

2. Denial of compulsory process

This is a case with international implications. The prosecutor is having a witness flown in from the Ukraine. The prosecutor, wants to put international correspondence into evidence. I have asked to bring 2 two defense witnesses from the Ukraine to prove 2 two important issues. While compulsory process is a right under the Sixth Amendment of the United States Constitution, as well as Article 1 Para. 10 of the New [J]ersey Constitution, yet the defendant has been denied this right.

3. Key defense witness on military duty in Kuwait.

From September 30th 2003, to October 5th 2005. The defense has key witnesses available. In October of 2004, the defendant provided my pool attorney with a copy of the key witnesses military orders and his email address. The witness has emailed the pool attorney but has not gotten a response. In spite of being well aware that the witness will not be available until September or October of 2005, the pool attorney inexplicably agreed to an August trial date. This is totally unfair to the defense. Defendant requests that this case be placed on the military list until the return

of the witness.

4. Denial of expert witness
The defendant has requested several experts to counter misleading and untrue statements of state witnesses. The issues are in the area of DNA forensic issues and unreliability of eye witness testimony.

Prosecutor has had at his disposal eleven detective, two investigators from the medical examiner office, the chief medical examiner, several attorneys in the prosecutor's office, the county prosecutor, the state police laboratory, aerial photography, and more that the defendant may not be aware of. Against the vast resources of the state, the defendant has a pool attorney and a public defender's office investigator for a few short weeks. The defendant contends that a fair trial is not possible in view of the lopsided resources of the state.
Defendant brings to the courts attention the MATTER OF CANNADY 126 N.J. 486 and requests an order that the public defender's office provide the aforementioned witnesses.

5. Defense investigation not started.
As of June 30th 2005, not a single defense witness has been fully interviewed. In fact one important witness left his employment in Okidata and has not been located since. It is impossible to think that the investigation will be anywhere near complete in the few weeks until the trial.

Respectfully yours,

_____

Lester S. Barney

ECF No. 5-50 at 99-100.

Criminal defendants have a right, under the Sixth Amendment, to self-representation. <u>Faretta v. California</u>, 422 U.S. 806, 832 (1975). But "the right to self-representation is

not absolute." <u>Indiana v. Edwards</u>, 554 U.S. 164, 171 (2008).

"When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel.  For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." <u>Faretta</u>, 422 U.S. at 835; <u>see also</u> <u>Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.</u>, 528 U.S. 152, 161-62, (2000) ("The defendant must voluntarily and intelligently elect to conduct his own defense, and most courts require him to do so in a timely manner") (internal quotations and citations omitted). "The information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." <u>Iowa v. Tovar</u>, 541 U.S. 77, 88 (2004).  Further, courts must "indulge every reasonable presumption against waiver" of the right to counsel. <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938).  Finally, "[s]ince the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis.  The right is either respected or denied; its

deprivation cannot be harmless." McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984); see also Buhl v. Cooksey, 233 F.3d 783, 806 (3d Cir. 2000).

In Faretta, because the accused had "*clearly and unequivocally* declared to the trial judge that he wanted to represent himself" and he did so "voluntarily [and intelligently]" by "exercising his informed free will", the Supreme Court held that forcing him to accept a state-appointed public defender "deprived him of his constitutional right to conduct his own defense." Id. at 836 (emphasis added).

Here, the PCR judge found, on remand, that the Letter was not a clear and unequivocal request to proceed *pro se*, nor a waiver of appointed counsel. ECF No. 5-55 at 4. The judge pointed to the "tone" and "length" of the Letter, as indicative of Petitioner's desire to "inform the Judge of his dissatisfaction with his attorney" as opposed to a clear and unequivocal desire to proceed *pro se*. ECF No. 5-55 at 4. The judge also pointed to the fact that the Letter was received just prior to jury selection, and that no evidence was presented during the evidentiary hearing demonstrating that Petitioner waived his right to counsel. Id.

Thus, this Court must assess whether the state court's determination was contrary to, or an unreasonable application of

clearly established Supreme Court precedent; the Court finds
that it was not. 28 U.S.C. § 2254(d)(1). From the outset, the
Court acknowledges that the Letter does appear unequivocal;
Petitioner stated his desire to proceed *pro se* twice, in capital
letters, and continued to make discovery demands prefaced with
the words "acting now PRO-SE". ECF No. 5-50 at 99–100.
Nevertheless, the Court is not permitted to review the state
court's decision for simple error.

Instead, because this case arises under 28 U.S.C. § 2254,
we must ascertain whether the decision is contrary to clearly
established Supreme Court precedent; whether it is
"diametrically different," "opposite in character or nature," or
"mutually opposed." Fischetti v. Johnson, 384 F.3d 140, 147 (3d
Cir. 2004) (citing Williams, 529 U.S. at 364. "[T]he state
court judgment must not merely be contrary to law as articulated
by any federal court. It must contradict clearly established
decisions of the United States Supreme Court alone." Id. at 147
(internal quotations omitted). In Fischetti, the Third Circuit
found the state court's application of Faretta was in error, but
still found the decision "was not contrary to, or an
unreasonable application of, Supreme Court precedent." Id. at
153.

The discussion of AEDPA deference in Fischetti is

especially helpful in this case.  The Fischetti Court explained
that in deciding whether a state court's decision is contrary
to, or unreasonably applies Supreme Court precedent, there is a
"requirement of particularity."  Id. at 148.  "The touchstone
precedents are not to be examined by looking to broad
pronouncements or generative principles in the opinion.  The
*materially indistinguishable* test presupposes a fact-specific
analysis of the Supreme Court case law."  Id. at 148 (internal
quotations omitted) (emphasis added).  Moreover, while
"decisions of federal courts below the level of the United
States Supreme Court may be helpful to us in ascertaining the
reasonableness of state courts' application of clearly
established United States Supreme Court precedent . . . we
emphasize that cases not decided by the Supreme Court do not
serve as the legal benchmark against which to compare the state
decision."  Id. at 149-50 (internal citations and quotations
omitted).

     Thus, this Court is required to "articulate the issue
presented to the state court precisely."  Id. at 150.  Here, the
precise question under review by the state court, was whether
the "defendant clearly and unequivocally made a request to the
trial court to represent himself or whether defendant
communicated with his attorney to make such a request on his

behalf." ECF No. 5-54. The state court found in the Remand Opinion, based on the Letter, that he had not. While the Supreme Court has articulated that a request must be made "clearly and unequivocally", this Court finds no Supreme Court precedent with "facts that are *materially indistinguishable* from the facts surrounding" Petitioner's actions in this case. Fischetti, 384 F.3d at 150 (emphasis added).

Parsing out the state court's Remand Opinion, the decision first emphasized the element of timing; the fact that the Letter was received one day prior to jury selection. ECF No. 5-55 at 3. The record reflects that the Letter was stamped by the court on August 10th, the day prior to jury selection, and during the evidentiary hearing, trial counsel testified that he read the Letter only moments before the jury was brought to the court. ECF No. 5-75 at 7.

There is little Supreme Court precedent that specifically addresses the issue of timing of a Faretta request. Nevertheless, in laying out the facts in Faretta, the Supreme Court stated that Faretta's request was made "[w]ell before the date of trial" and "weeks before trial." 422 U.S. at 807, 835. See, e.g., Marshall v. Taylor, 395 F.3d 1058, 1060-61 (9th Cir. 2005) (explaining that because "the Supreme Court incorporated the facts of Faretta into its holding . . . the holding may be

read to require a court to grant a <u>Faretta</u> request when the request occurs weeks before trial") (internal quotations omitted). In <u>Martinez</u>, the Supreme Court explained that "most courts require [a Petitioner to assert the right to self-representation] *in a timely manner*." 528 U.S. at 162 (emphasis added). See, e.g., <u>Parton v. Wyrick</u>, 704 F.2d 417, 419 (8th Cir. 1983) (affirming trial court's refusal to let defendant proceed *pro se* when request was made on morning of the trial); <u>United States v. Gillis</u>, 773 F.2d 549, 559 (4th Cir. 1985) ("right to self-representation can be waived by failure [to] timely assert it"). While the Third Circuit has found requests to proceed *pro se* immediately before trial to be valid, <u>see, e.g.</u>, <u>Alongi v. Ricci</u>, 367 F. App'x 341, 346–47 (3d Cir. 2010) (where a request was made "before jury selection"); <u>United States v. Peppers</u>, 302 F.3d 120, 124 (3d Cir. 2002) (involving a federal inmate who orally requested to proceed *pro se* "just before jury selection"), no Supreme Court case has decided this precise issue. Thus, on this matter, the Court cannot say that the state Court's decision was contrary to, or an unreasonable application of, Supreme Court precedent.

Next, the Remand Opinion pointed to the fact that the Letter was not a clear and unequivocal request to proceed *pro se*, because of the overall "tone" and "length" of the Letter.

ECF No. 5-55 at 4.  No Supreme Court precedent has precisely

defined the contours of the phrase "clearly and unequivocally."

Were this Court to extrapolate general principles from that

phrase, the Letter would likely fall within that definition.

But that is not the Court's role; the facts of <u>Faretta</u> and

subsequent Supreme Court decisions on this matter are simply too

distinguishable from the facts here.  In <u>Faretta</u>, the petitioner

had "requested that he be permitted to represent himself" and

the "judge sua sponte held a hearing"; the clear and unequivocal

nature of the request was not in dispute.  422 U.S. at 807-08.

Here, the precise question under review is whether Petitioner's

request was clear and unequivocal.  The judge here, never held a

hearing or inquired into Petitioner's request.

Similarly, in <u>Indiana v. Edwards</u>, 554 U.S. 164, 167 (2008),

it was undisputed that the petitioner had made "two self-

representation requests."  In <u>Edwards</u>, the sole question was

whether the petitioner was mentally competent to waive his right

to counsel, facts entirely different from this case.  <u>See also</u>

<u>Godinez v. Moran</u>, 509 U.S. 389 (1993); <u>Iowa v. Tovar</u>, 541 U.S.

77 (2004).  There simply is no Supreme Court precedent that

precisely answers the question before us, with facts "materially

indistinguishable" from the facts here.  Indeed, the Supreme

Court denied a writ of certiorari in <u>Raulerson v. Wainwright</u>,

469 U.S. 966 (1984) on a case with facts somewhat analogous to
this case.  In Raulerson, the Eleventh Circuit had found the
petitioner had failed to make an "unequivocal" request to
proceed *pro se*, by, among other things, "sen[ding] a letter to
the judge requesting permission to appear pro se" which "[t]he
court did not immediately act on", because he "did not pursue
the matter" and while "a defendant need not continually renew
his request to represent himself even after it is conclusively
denied by the trial judge, he must pursue the matter
diligently." [1]  732 F.2d 803, 808-09 (11th Cir. 1984) (internal
citations and quotations omitted).

A number of federal courts, including the Third Circuit,
have addressed the clear and unequivocal nature of written
requests to proceed *pro se* that were sent directly to the court.
In Brathwaite v. Phelps, 418 F. App'x 142 (3d Cir. 2011), the
Third Circuit, in an unpublished opinion, addressed a slightly
different issue — whether the petitioner had waived his right to

_____

[1]    In a dissenting opinion, Justice Marshall found the
Eleventh Circuit erred, explaining that the Petitioner's request
was clear and unequivocal and the court erred by failing to
conduct an inquiry: "the *failure* to hold a Faretta inquiry at
this time *will* do injury to the right recognized in Faretta.
Delay in holding a hearing after the right is unequivocally
asserted undermines that right by forcing the accused to proceed
with counsel in whom he has no confidence . . . ."  Raulerson v.
Wainwright, 469 U.S. at 969-70 (Marshall, J., dissenting)
(emphasis in original).

self-representation after his first counsel was relieved, and he appeared to acquiesce to the appointment of his second counsel. While the issue addressed was different, the Court went out of its way to express, "[w]e agree with Brathwaite, the Supreme Court of Delaware, and the District Court that Brathwaite clearly asserted his right to self-representation and that the Delaware trial court erred by not addressing his motion to proceed pro se." Id. at 146. Braithwaite had filed a "Motion to proceed Pro Se" with the trial court, it was docketed, and the trial court forwarded the motion to his counsel stating it would "not consider pro se applications by defendants who are represented by counsel unless the defendant has been granted permission to participate with counsel in the defense."[2] Id. at 143.

While the Court in Braithwaite found the petitioner had "clearly" asserted his right to proceed *pro se* in the motion; that is not dispositive. Braithwaite is not a Supreme Court

---

[2]   The Court in Braithwaite outlined the points raised in Braithwaite's motion: "He stated that he thought 'he would be more effective than his present counsel,' David Facciolo, and that Facciolo refused to consider 'many motions that [Brathwaite] has requested to be filed that would have been very instrumental to his release from custody.' He also claimed that he was 'being conspired against by the Attorney General's office and by the attorney's [sic] in the State of Delaware.'" Brathwaite, 418 F. App'x at 143.

decision, nor was the Court addressing the precise issue before this court. As well, there are a number of factual differences. In Braithwaite, the petitioner had filed a motion to proceed *pro se* — which is "properly 'perfected' [in Delaware] when filed with the court" — and the motion was docketed. Id. at 143–44. The court in Braithwaite, therefore, was certainly aware of the motion and was likely aware of its contents. Here, in contrast, the record indicates that the trial judge never read the Letter; on August 10, 2005, just prior to jury selection, the trial judge stated:

> THE COURT: I have another letter from Mr. Barney and he's not representing himself so I'm going to give you this letter, Mr. Riley [trial counsel]. I haven't read the letter from Mr. Barney. . . .
>
> This letter is dated July 21st. He's not representing himself. I don't know why he continues to write the Court. I'm handing the letter to you, Mr. Riley. . . .

ECF No. 5-77 at 2–3.

In Buhl v. Cooksey, 233 F.3d 783 (3d Cir. 2000), the Third Circuit reversed a district court's denial of habeas relief of a state prisoner, finding the state court erred in rejecting the petitioner's request to represent himself. In Buhl, the petitioner "filed a written motion to dismiss counsel and proceed *pro se*. In an affidavit accompanying that motion Buhl

stated that he was dissatisfied with his attorney's
investigation and that his lawyer was incompetent." Id. at 787.
The judge then held a hearing a month later, and denied Buhl's
request of self-representation. Id. at 792–93. Buhl then
reiterated his request, which was again denied. Id. at 793.
The Court explained that Buhl adequately asserted his right to
self-representation, stating that "[a] defendant need not recite
some talismanic formula hoping to open the eyes and ears of the
court to his request to invoke his/her Sixth Amendment rights
under Faretta." Id. at 792 (internal citation and quotations
omitted).

There are, however, a number of glaring differences between
Buhl, and the case before this Court. First, in Buhl, it was
"undisputed that Buhl filed a *written* motion to proceed *pro se* .
. . and it [wa]s clear that the trial court understood that Buhl
was asserting th[at] right because the court held a hearing on
that motion a month later. . ." Id. at 792 (emphasis in
original). Here, those precise facts are in dispute and under
review; it is not evident that the Letter was a motion to
proceed *pro se*, nor if the trial court ever read or understood
the Letter as such. Moreover, the Third Circuit "decided Buhl
[u]nder the pre-AEDPA standard and did not give any deference,
much less the significant deference that § 2254(d) now demands,

to [t]he state court's legal findings." Brathwaite, 418 F.
App'x at 147 (internal quotations omitted).  Thus, Buhl is not
dispositive for our purposes.  See also, Dorman v. Wainwright,
798 F.2d 1358, 1366 (11th Cir. 1986) (wherein the Eleventh
Circuit affirmed the decision of the district court in finding
the petitioner had "clearly" invoked his right of self-
representation where the trial court's "constant summary denial
of [petitioner's] requests" prevented the court from determining
if he had made a "knowing and intelligent" waiver of his right
to counsel.)  Here, because the Court finds the facts of this
case unique, with no "materially indistinguishable" Supreme
Court precedent, the Court cannot say that the state court's
decision was contrary to, or an unreasonable application of
Supreme Court law on this matter.

Finally, the state court explains that Petitioner never
waived his right to counsel.  ECF No. 5-55 at 4.  A review of
record reflects that the only time Petitioner asserted his right
to proceed *pro se* before the trial court was in the Letter which
the judge stated he had not read.  ECF No. 5-77 at 3.  It is
true that Petitioner was never given a hearing in which to
expressly waive that right, and the letter may indicate as much.
Nevertheless, for the reasons articulated above, the Court
cannot say that the state court's decision was objectively

unreasonable. _Williams_, 529 U.S. at 410.  _See, e.g._, _Von Moltke v. Gillies_, 332 U.S. 708, 723 (1948) (there is a "strong presumption against waiver of the constitutional right to counsel"); _Brewer v. Williams_, 430 U.S. 387, 404 (1977) (courts should indulge "every reasonable presumption against waiver" of the right to counsel); _Martinez_, 528 U.S. at 161 ("it is representation by counsel that is the standard, not the exception"); _Adams v. Carroll_, 875 F.2d 1441, 1444 (9th Cir. 1989) (requiring unequivocal request for waiver serves "institutional purpose" of preventing defendant "from taking advantage of the mutual exclusivity of the rights to counsel and self-representation"); _United States v. Purnett_, 910 F.2d 51, 55 (2d Cir.1990) ("A district court is not obliged to accept every defendant's invocation of the right to self-representation."). The Court is therefore satisfied that while the state court decision was likely in error, and while the Court finds the decision troublesome, it was not contrary to, or an unreasonable application of Supreme Court precedent.  As such, this claim must be denied.

## B. Ground Seven: Ineffective Assistance of Counsel and Proceeding _Pro Se_

This necessarily leads the Court to Petitioner's claim of ineffective assistance of counsel — whether trial counsel was

ineffective in failing to raise Petitioner's request to proceed *pro se*. In Petitioner's brief on petition for PCR and in his brief on appeal from the denial of PCR, Petitioner addressed this claim in passing.[3] Further, he only alludes to it parenthetically here, by stating "the defendant was denied his right to the effective assistance of trial [counsel] . . . when counsel failed to investigate and raise issues contained in g[r]rounds one through six of this petition." ECF No. 1 at 24.

"To 'fairly present' a [federal] claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." <u>McCandless v. Vaughn</u>, 172 F.3d 255, 261 (3d Cir.1999) (citations omitted). "A petitioner can

---

[3]    In a *pro se* supplemental letter brief on petition for PCR, under the heading "DEFENDANT'S CONVICTION MUST BE REVERSED BECAUSE THE COURT REFUSED TO ALLOW HIM TO PROCEED <u>PRO SE</u> OR OTHERWISE HOLD A <u>FAR[]ET[T]A</u> HEARING, DESPITE DEFENDANT'S REPEATED REQUESTS TO PROCEED *PRO SE*", he states in his final paragraph "Furthermore, trial counsel was ineffective for not requesting a <u>Faretta</u> hearing on this matter and petitioning the court to allow defendant to proceed <u>pro se</u>." ECF No. 5-23 at 2, 5.

    In Petitioner's *pro se* brief to the Appellate Division on appeal from the denial of PCR, his claim is less apparent. He alludes to it only in passing; the heading reads: "THE DEFENDANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL . . .", he explains, "The defendant repeats the legal arguments set forth above in POINTS I [defendant clearly and unequivocally notified the trial court that he desired to proceed *pro se*] . . . as if set for[th] in its entirety herein." ECF No. 5-49 at 46.

'fairly present' his claims through: (a) reliance on pertinent federal cases; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Nara v. Frank, 488 F.3d 187, 198 (3d Cir. 2007) (citing McCandless, 172 F.3d at 260). Nevertheless, because Respondents concede that all claims raised in the instant Petition are fully exhausted, and Petitioner has raised it, to some degree, below, the Court construes this claim to be exhausted. ECF No. 5 at 99.

In the New Jersey Supreme Court's remand order, the evidentiary hearing was mandated to assess both if the "defendant clearly and unequivocally made a request to the trial court to represent himself or *whether defendant communicated with his attorney to make such a request on his behalf*." ECF No. 5-54 (emphasis added.) While it is not certain whether this language is intended to include an assessment of ineffective assistance of counsel, the Court reads it as such. Moreover, during the evidentiary hearing, Petitioner's defense counsel was called to testify, and was questioned about Petitioner's request to counsel to proceed

*pro se*, as well as counsel's understanding of the contents of the Letter. ECF No. 5-75 at 5-14. The Court, therefore, turns to the Remand Opinion, in assessing whether the state court's decision on this matter was contrary to, or an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

The Remand Opinion, cited in full above, does not specifically address whether counsel was deficient, stating generally: "the defendant did not clearly and unequivocally make a request to the trial court to represent himself and *the defendant's communication with his attorney to make such a request on his behalf was not clearly and unequivocally made*." ECF No. 5-55 at 3 (capitalized in original) (emphasis added). The court further explained:

> There is no evidence that was presented to this Court during the Evidentiary Hearing that this right to counsel was waived by the defendant.
>
> . . .
>
> Based on the testimony presented at the evidentiary hearing this Court does not find that the defendant made a clear and unequivocal request to proceed pro-se.

Id. 5-55 at 4-5.

While the Remand Opinion does not appear to address ineffective assistance of counsel directly, the Court must still

grant AEDPA deference to the state court's decision.  The

Supreme Court, in <u>Johnson v. Williams</u>, 568 U.S. 289, 298–301

(2013), has explained,

> In [<u>Harrington v. Richter</u>, 562 U.S., [86, 100
> (2011)], 131 S. Ct., at 785, we held that §
> 2254(d) 'does not require a state court to
> give reasons before its decision can be deemed
> to have been 'adjudicated on the merits.'
> Rather, we explained, '[w]hen a federal claim
> has been presented to a state court and the
> state court has denied relief, it may be
> presumed that the state court adjudicated the
> claim on the merits in the absence of any
> indication or state-law procedural principles
> to the contrary.'  <u>Id.</u>, at [99], 131 S. Ct.,
> at 784–785.
>
> . . .
>
> Although <u>Richter</u> itself concerned a state-
> court order that did not address any of the
> defendant's claims, we see no reason why the
> <u>Richter</u> presumption should not also apply when
> a state-court opinion addresses some but not
> all of a defendant's claims"
>
> . . .
>
> In sum, . . .[w]hen a state court rejects a
> federal claim without expressly addressing
> that claim, a federal habeas court must
> presume that the federal claim was adjudicated
> on the merits—but that presumption can in some
> limited circumstances be rebutted.

The Supreme Court has also stated that "[w]here a state

court's decision is unaccompanied by an explanation, the habeas

petitioner's burden still must be met by showing there was no

reasonable basis for the state court to deny relief."

<u>Harrington</u>, 562 U.S. at 98.  Thus, because Petitioner's claim has been presented to the state court, the Court must presume the state court adjudicated this claim on the merits.

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  Generally, a claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  <u>Id.</u> at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  <u>Id.</u> at 687–88.  To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  <u>Id.</u> at 690.  The court must then determine whether, in light of all the circumstances at the time, the identified errors fell "below an objective standard of reasonableness." <u>Hinton v. Alabama</u>, 134 S. Ct. 1081, 1088 (2014).

Second, a petitioner must establish that counsel's "deficient performance prejudiced the defense so as to deprive

the defendant of a fair trial." Strickland, 466 U.S. at 669.
To establish prejudice, the defendant must show that "there is a
reasonable probability that the result of trial would have been
different absent the deficient act or omission." Id. at 1083.
On habeas review, it is not enough that a federal judge would
have found counsel ineffective. The judge must find that the
state court's resolution of the issue was unreasonable, a higher
standard. Harrington, 562 U.S. at 101.

Based on the evidentiary hearing, the Court again finds
that while the state court's decision on this matter may have
been incorrect, the Court cannot say that the decision is
"objectively unreasonable." Williams, 529 U.S. at 410. During
the 2013 evidentiary hearing, trial counsel, Michael Riley, was
questioned about the events that took place on August 10, 2005,
on the day the trial judge refused to read the Letter. ECF No.
5-75. Mr. Riley first explained, on direct-examination, that at
times there was "friction" between him and Petitioner:

> RILEY: And I can recall situations where it was like, in other
> words, if you don't do it my way, I'm going to do it myself
> or words to that effect. Nothing was memorialized that I can
> recall other than the letter that Judge Almeida gave me in
> August that I discussed with him in the holding cell.

Id. at 6.

Mr. Riley then testified,

> RILEY: As I recall that letter . . . [h]e said that he wanted

to proceed pro se and I said, well, that's your right but right now with the jury coming up and we're getting ready to proceed, we'll have to have a hearing on that. You just can't walk in and represent yourself. You've got to go through a process. And I said, well, that's fine, then, you know, the Judge is aware of your concerns and obviously it's in the letter and we'll deal with it. But right now the jury was being brought up in the elevators as I remember and the focus at that time was get squared away and begin to pick the jury. . . .

At that point, however, we terminated the conversation and we went back out and began picking the jury. The conversation in the holding cell didn't take very long. It was relatively short.

Q: Okay. And when you say the conversation was terminated, do you recall Mr. Barney making any, any statement then as to what he was going to do, if anything, on that issue of proceeding pro se?

RILEY: I don't recall. I don't recall him saying anything beyond our conversation. And I've really tried to stretch my memory on this but I don't recall having a conversation with him on that topic after the conversation in the holding area. I don't recall anything, any conversation with him beyond that conversation the day of the letter. And I don't believe he ever raised it with Judge Almeida on the record because Mr. Barney wasn't shy about piping up when he had an issue and saying, well, Judge, I'd like to be heard on this and the judge would accommodate him and listen to what he had to say. I don't recall him -- and I could be wrong about this, it's been a long time -- whether he ever brought it up sua sponte, so to speak, on his own after that date.

Id. at 7-8.

Mr. Riley was then questioned by the State on cross-examination:

Q: When you say you don't recall having any conversation with him about proceeding pro se after the conversation in the holding area, did you come to a conclusion as to how he wanted to proceed?

RILEY: I don't think, I don't think I thought much about it

37

at that point because we were, like I said, in the process of picking a jury and we went into that.

. . .

Q: If he had stated affirmatively that he wanted to proceed pro se, would it have been your practice to bring it to the attention of the Judge?

RILEY: Oh, sure.  In fact, that is what he, essentially he had done that in the letter.  He had indicated that he wanted -- well, you've seen the letter.  The letter speaks for itself, but I don't recall ever going back to him and saying, Mr. Barney, you know, do you still want to go pro se or anything like that.  I don't think we had that conversation or any conversation like that.  I just don't recall if we did.

Q: Okay.  And that is the letter that the Judge said he didn't read, though, however?

RILEY: That is the one that he said -- I recall him saying he didn't read it.  I don't know, I haven't seen – I looked at the transcript but I don't remember exactly what he said.

. . .

Q: Okay.  The Judge said he didn't read it.  If during your conversation with Mr. Barney if he had said affirmatively I want to proceed pro se, would you have addressed that to the Judge at that time?

RILEY: If he had said to me I want to go pro se?

Q: Yes.

RILEY: That definitively?

Q: Uh huh.

RILEY: Yeah.

Q: Okay.  Thank you.  Was it your practice to bring matters that the defendant, that Mr. Barney raised to your attention to the Judge?

RILEY: Mr. Barney's practice was if he had issues he would raise them with the Judge and the Judge I think made reference in here, this transcript to receiving a number of letters. Actually it was in this transcript in July that he received letters from Mr. Barney, that he read all the letters and he had a complete file. He assured Mr. Barney because Mr. Barney said something to the effect he was concerned about whether all the letters were being kept or preserved somehow and Judge Almeida I think made a point, I think in this transcript in July, that he had all the letters from Mr. Barney and he had a file of all the letters from Mr. Barney so he made reference to Mr. Barney in response to Mr. Barney that I have all your letters, I've read them and they're in my file. Now that was prior to August.

. . .

Q: And just to clarify, if he had said definitively he wanted you to tell the Judge that he wanted to proceed prose, you would have told the Judge?

RILEY: If he said to me, if he said to me unequivocally, I want to proceed pro se, I would have told the Judge. I would have given the Judge the letter. I would have told the judge this is what his wishes are and we would have had to proceed at that point and deal with it.

Id. at 8–10.

Mr. Riley then testified further on redirect:

Q: So at that point, your understanding was that Judge Almeida had not read the letter?

RILEY: That's my recollection of him, said he had not read the letter.

Q: But at that point did you provide the letter to Judge Almeida or reference it to Judge Almeida?

RILEY: It's inconceivable to me that I didn't reference it in some way to Judge Almeida. Given the circumstances and given Mr. Barney, I would have, I know I would have referenced it to Judge Almeida, either giving him the letter, basically

giving him the letter and telling him what it obviously suggests or I would have said to him, Judge, we're going have to have a hearing because the man's saying he was going to go pro se. Do I remember that? No. I don't remember talking to Judge Almeida directly about it but I can't imagine in a situation that way that I had information such as this and did not obviously tell the trial judge at some point either prior or during the jury selection . . .

Id. at 11–12.

And finally, on re-cross, Mr. Riley testified:

Q: Did Mr. Barney equivocate a lot? Did he equivocate in his proceeding pro se versus being represented by you?

RILEY: At what point in time?

Q: I mean, did he threaten to proceed pro se, did he use it as a bargaining chip sort of I guess?

RILEY: There were times when he said to me if I don't–you're not doing this right, you're not doing that right, if you don't do it this way or that way, then I'm going to go pro se. It was not -- it was one of those conditional kind of conversations. That went over a relative -- not a long time but a period of time. There was never a time when he said to me that I recall other than this time frame we're talking about that there was an indication that he wanted to go pro se, okay? It was always conditional on something.

Q: And you don't recall having a conversation with him after the July 14th hearing where he stated affirmatively that –

RILEY: I don't, I don't recall that. Now if he says that we had a meeting and I discussed it with him, maybe his recollection's better than mine. I just don't remember that. I do specifically remember the conversation in the holding room, the letter in my hand talking to him about the letter. That I do remember.

Q: And at that point he didn't indicate one way or the other how he wanted to proceed?

RILEY: He, what he said to me was consistent with what he

said in the letter and that's why I know when I was questioned, you know, by Mr. Farrow [attorney for petitioner] about what I would have done with it, that's why it seemed -- because if he had said to me, hypothetically, if I took the letter back there and he said, ah, you know, don't worry, I don't mean that, I would have been like, all right, you don't mean that, but I don't think what we discussed, and I don't remember the exact words but I do remember there was a conversation that he did not disavow the letter, okay? And that's why when Mr. Farrow asked me, I know I would have brought that to the Judge's attention in some fashion so the Judge was aware of what the contents of the letter, cause the Judge had to have this letter. I mean it's impossible he could have had a file of correspondence from Mr. Barney and not have this letter at some point. He had to. Either I would have given it to him or he would have had a copy of it because it's obviously a very significant letter and Judge Almeida as he indicated had a file filled with Barney letters. That's how I recall it.

Id. at 12–13.

Petitioner then testified at the evidentiary hearing, explaining that immediately after the July 14th hearing, in which Petitioner expressed discovery concerns, Petitioner spoke with Mr. Riley and informed him: "I had decided that I'm going to go pro se and he should go downstairs and tell the judge . . . well, naturally I presumed [Mr. Riley] went downstairs and told Judge Almeida." ECF No. 5-75 at 15–16. Petitioner then explained that he "presumed that [Mr. Riley] was seeing me in his role as stand-by counsel. . ." after the July 14th hearing. Id. Petitioner then testified on direct-examination about the events that took place on August 10th, at the hearing in which the judge refused to read his Letter:

41

Q: And do you recall in your review of the transcript where Judge Almeida referenced the letter that he had received from you?

A: Yes.  Most definitely.  I'll never forget it.  The Judge was very angry as he was waving the letter as he came through the door right behind Your Honor and he was extremely angry and he looked directly at me and told me that Mr. Barney is not representing himself.

Q: What was, what was your understanding of what he meant when he said that?

A: My request was denied.

Q: However, do you also recall him saying I haven't read the letter from Mr. Barney at that point?

A: I did hear him say that and I felt, you know, that's sort of inconceivable that a letter so important that on the eve of trial would not be referenced or even read.  Frankly, sir, I didn't believe it.

Q: But again after he said he's not representing himself, did at any point you think that his decision was not final on that issue, meaning Judge Almeida's?

A: Sounded final to me until I addressed it again with Mr. Riley.

Q: And now let's talk about that.  So at some point on August 10th you recall having a conversation with Mr. Riley about this letter?

A: Yes.  We were, I think that was jury selection and again I was in the holding area and Mr. Riley came back with the letter.

Q: And what, if anything, do you recall Mr. Riley telling you about the letter?

A: I asked -- I brought it up. I said you have the letter in your hand.  You know what I want and I know what he said.  He said the Judge addressed that.

. . .

Q: So really what I was going to ask first, though, Mr. Barney, is was there any point that you recall that perhaps did not make the record, okay, and was not in the transcript -- we know what's in the transcript. Was there any point that you recall you said something to Judge Almeida about your desire to represent yourself after he referenced this letter?

A: Well, no, because it was clear to me that a decision had been made.

Q: So that was the answer to my next question. Why did you not do that?

A: Well, he just told me I wasn't going to represent myself so that was, that was clear, it was done. I mean, my request was denied. So we went on to -- of course, that day I did address it with Mr. Riley. As a matter of fact, he did speak of that. And he told me the Judge had already addressed it.

Id. at 17-18.

Referring to the testimony of Mr. Riley, the Court first notes that there is nothing in the record to indicate that Mr. Riley ever spoke with the trial judge about the contents of the Letter or Petitioner's request to proceed *pro se*. Nevertheless, the Court cannot say that the state court's decision was unreasonable under Strickland. While Mr. Riley's memory during the evidentiary hearing was imperfect, at best, he did indicate that Petitioner often complained to him about his representation, and threatened to proceed *pro se* more than once. ECF No. 5-75 at 5-6. Further, Mr. Riley testified that had Petitioner unequivocally told counsel that he wanted to proceed

43

*pro se*, counsel would have brought that to the attention of the court and would have given the judge the Letter. <u>Id</u>. at 9–10. Further, trial counsel testified that Petitioner never raised the issue again with him after the single conversation they had regarding the Letter, just moments before the parties were to begin picking the jury. <u>Id.</u> at 7–8.

While it is true that Petitioner testified to having told Mr. Riley in clear terms that he intended to proceed *pro se*, and explained that he never raised the issue again because he believed the judge denied his request, the state court did not make a factual finding on that matter. As such, the state court decidedly rejected Petitioner's account, in finding Petitioner did not raise the matter of self-representation clearly and unequivocally. As such, the Court cannot say that the state court's decision was objectively unreasonable, insofar as trial counsel's performance did not fall below an objective standard of reasonableness, as required under <u>Strickland</u>.

Further, with respect to the prejudice prong of <u>Strickland</u>, the Court notes that while the underlying constitutional violation of one's right to self-representation is treated as a structural error and a petitioner would be entitled to reversal without inquiring into prejudice, <u>McKaskle</u>, 465 U.S. at 177, the Supreme Court has never directly answered whether the analysis

44

of prejudice is altered when the denial of the right to self-representation is raised in the context of ineffective assistance of counsel.  In a recent Supreme Court decision, Weaver v. Massachusetts, 137 S. Ct. 1899 (2017), the Supreme Court discussed the interplay between structural errors and ineffective assistance of counsel.  In Weaver, the accused claimed his right to a public trial was violated, arguing his counsel was ineffective for failing to object to a courtroom closure which took place during his trial.  Id. at 1906.  The Massachusetts Supreme Judicial Court affirmed the denial of his claim recognizing that while a right to a public trial is structural, the accused had failed to demonstrate prejudice. Id. at 1907.

The Supreme Court granted certiorari and held that "when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, Strickland prejudice is not shown automatically."  Id. at 1911.  Thus, the prejudice prong of Strickland was maintained in that case.  The Supreme Court constrained its holding to the facts of that case, stating that the opinion was decided "specifically and only in the context of trial counsel's failure to object to the closure of the courtroom during jury selection."  Id. at 1907.

Recognizing that the holding in Weaver is claim-specific,

there is no clearly established Supreme Court precedent that has decided the issue in the context of self-representation. See also Pirela v. Horn, 710 F. App'x 66, 83 n.16 (3d Cir. 2017) (citing Weaver, 137 S. Ct. at 1911) (discussing the holding in Weaver in the context of waiver of the right to a jury trial, and appearing not to do away with the prejudice prong of Strickland: "[u]nder Weaver, even if [petitioner's] counsel's conduct led to structural error, that term 'carries with it no talismanic significance' because [petitioner] cannot show either a reasonable probability of a different outcome in his case, or that the error was 'so serious as to render his. . .trial fundamentally unfair.' ")

Under the prejudice prong of Strickland, it is Petitioner's burden to demonstrate that "there is a reasonable probability" that absent his counsel's failure to raise Petitioner's request to proceed pro se, "the result of the proceeding would have been different." Strickland at 694. Petitioner simply has not met this burden; he has failed to present any facts or reasoning to support the allegation that the outcome of the case would have been altered. The Court simply cannot invent those reasons for him. See, e.g., Weaver, 137 S. Ct. at 1908 ("the defendant's right to conduct his own defense . . . when exercised, usually increases the likelihood of a trial outcome unfavorable to the

46

defendant.") (internal quotations and citations omitted);

Faretta, 422 U.S. at 834 ("[i]t is undeniable that in most

criminal prosecutions defendants could better defend with

counsel's guidance than by their own unskilled efforts.")  While

the Court is quite troubled by what occurred, the Court cannot

say that the state court decision was objectively unreasonable.

Therefore, this claim must similarly be denied.

### C. Ground Two: Ineffective Assistance of Counsel, Expert Testimony

Petitioner next argues that his trial counsel was

ineffective for failing to present a blood spatter expert which

was necessary to substantiate his version of the stabbing.  ECF

No. 1 at 14, 19.

The Superior Court of New Jersey, Appellate Division, in

affirming the denial of PCR, addressed this claim and found it

meritless:

> Even if trial counsel had presented blood
> spatter evidence of the sort reflected in the
> expert report of Norman Reeves, defendant has
> failed to establish, in light of the
> conflicting inferences that could be drawn
> from such evidence and the overwhelming
> evidence of defendant's guilt, that there is
> a "reasonable probability" the outcome of the
> trial would have been different if such
> evidence had been presented at trial.  See
> Strickland v. Washington, 466 U.S. 668, 694–
> 95, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674,
> 698 (1984).  Even if such expert opinion
> evidence could have created doubt as to

whether the murder occurred precisely as
theorized by the prosecutor, the photographs
of the victim's wounds and the medical
examiner's testimony regarding those wounds
proved beyond any doubt that the victim's
death could not have occurred by accident or
in self-defense, as defendant testified.
Therefore, the failure to present such expert
testimony did not constitute ineffective
assistance of counsel.

ECF No. 5-53 at 7.

Here, the state court appropriately applied Strickland to

the facts of this case. As evidenced by the trial transcript,

there was ample evidence for the jury to find Petitioner guilty

of the murder of his wife, such that he was not prejudiced by

his trial counsel's failure to introduce a blood spatter expert.

Thus, as the state court correctly articulated, even had the

expert been introduced, it is not reasonably probable that the

outcome would have changed. See Strickland, 466 U.S. at 681;

Hess v. Mazurkiewicz, 135 F.3d 905, 908 (3d Cir. 1998) ("Our

review of ineffective assistance of counsel claims does not

permit us, with the benefit of hindsight, to engage in

speculation about how the case might best have been tried. We

therefore accord counsel's strategic trial decisions great

deference"); Harrington, 562 U.S. at 106 ("Rare are the

situations in which the wide latitude counsel must have in

48

making tactical decisions will be limited to any one technique or approach.") (internal citations and quotations omitted).

The evidence against Petitioner was substantial. The record shows that Mr. Hanney testified that Petitioner told him "I grabbed her by the wrists and I cut her." ECF No. 5-65 at 85. No blood was found on the clothing Petitioner was reportedly wearing that day. Id. at 41. Detective McDowell, a crime scene investigator, testified that there were no signs of struggle at the crime scene, and the victim was found in the car with sunglasses still on her head. Id. at 48–50. A medical examiner testified that based on the injuries, the weapon causing the injury cut deep into the victim's neck, past the Adam's apple, the pharynx, and the cervical vertebra. ECF No. 5-66 at 69. Based on these facts, and more that can be gleaned from the record, the evidence weighed heavily against Petitioner. As such, the state court was correct in rejecting this claim, and the Court will deny habeas relief on this claim.

### D. Ground Three: Trial Transcript

In Ground Three, Petitioner argues that the trial court erred in providing the jury with a transcript of witness testimony instead of providing them with a readback of the testimony. ECF No. 1 at 15.

The Appellate Division, on Petitioner's direct appeal,

reviewed this claim and found it meritless:[4]

> During deliberations, the jury requested a readback of defendant's testimony regarding his struggle with Alla and of the entire testimony of the medical examiner, Dr. Dante Ragasa. The trial court commented that it would be quite time-consuming to read back all this testimony and asked counsel:
>
> > [D]oes it make sense to simply have [the court reporter] certify the record of that testimony in [the] form of a transcript and give that to them in its entirety rather than read it back?
>
> Defense counsel responded, "I would suggest that, Judge, it makes more sense[,]" and the prosecutor had no objection to this proposal. However, defendant now argues that it was reversible error for the court to provide the jury with transcripts of this testimony rather than to have it read back in the courtroom.

---

[4]    Petitioner also raised this claim on his appeal from the denial of PCR; the Appellate Division denied this claim stating the claim was barred because it had been addressed previously on Petitioner's direct appeal, but adding:

> Moreover, even if this argument were not foreclosed by Rule 3:22-5, we would conclude that because defendant's trial counsel acquiesced in the court's decision to provide the jury with a transcript of trial testimony rather than a readback, and defendant has made no showing of how he could have been prejudiced by this procedure, it did not constitute reversible error.

ECF No. 5-53 at 6-7.

> A readback of testimony at the request of
> the jury is discretionary with the trial
> court.  State v. Wilson, 165 N.J. 657, 660
> (2000).  Although the court rules do not
> contain specific authorization for the trial
> court to provide the jury with a transcript
> of trial testimony rather than to read back
> that testimony in open court, there is also
> no prohibition against this procedure.
> Moreover, defendant specifically consented
> to the procedure and has not shown how he
> could have been prejudiced by the court
> providing the jury with transcripts of trial
> testimony rather than having it read back
> in open court.  In addition, the court
> carefully instructed the jury regarding
> their responsibilities when reading the
> transcripts.  Therefore, we conclude that
> the use of this procedure did not constitute
> reversible error.

ECF No. 5-16 at 12–13.

While this claim appears to present matters purely of state law, to the extent this Court can construe it as a federal claim, the court's error, if any, is harmless.  Under the harmless error standard, a petitioner will not be entitled to habeas relief unless s/he has demonstrated "'actual prejudice,' in the form of a substantial and injurious effect or influence in determining the jury's verdict."  Eley, 712 F.3d at 847 (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  Petitioner has not articulated, nor can the Court perceive of any actual prejudice from the judge presenting the jury with the transcript of the witnesses.  The jury had already heard

testimony from these witnesses, such that the transcript provided nothing new.  Further, the judge assured the jury that the transcript was certified as accurate.  The trial judge stated that the court reporters "will not under any condition . . . release a transcript to anyone without having the time to review it and to certify it as being accurate."  ECF No. 5-71 at 8.  Finally, the judge articulated that because the jury requested a readback of testimony from the defendant related to his struggle with the victim, which would be nearly impossible to parse out and would encompass over 200 pages, it was more appropriate to give the jury the entire transcript.  ECF No. 5-71 at 8-9.  Because Petitioner has failed to demonstrate substantial harm from the alleged error, the state court did not violate clearly established federal law in denying this claim.  Therefore, the Court denies habeas relief on this claim.

**E. Ground Four: Jury Instruction on Causation**

In Ground Four, Petitioner argues that the trial court erred in failing to instruct the jury with respect to causation.  ECF No. 1 at 17.  Petitioner explains that the court instructed the jury with the model jury instructions reserved for killings where causation is not at issue, but Petitioner's version of the victim's death highlights that causation was at issue.  <u>Id.</u>

Petitioner raised this claim in a *pro se* supplemental brief

on direct appeal, ECF No. 5-14, and the Appellate Division affirmed stating only: "[d]efendant's arguments are clearly without merit. R. 2:11-3(e)(2)." ECF No. 5-16 at 10.

Petitioner's brief to the Appellate Division on direct appeal, cited only to state law in support of his claim. Thus, Petitioner's claim has not been "fairly presented". See Duncan v. Henry, 513 U.S. 364, 365-66 (1995); see also McCandless, supra, 172 F.3d at 261 (explaining that a federal claim is only "fairly presented" where the claim's "factual and legal substance [was presented] to the state courts in a manner that puts them on notice that a federal claim is being asserted").

Even if this Court construes this as a federal claim, the Court does not find that Petitioner's Due Process rights have been violated by the trial court's failure to instruct the jury regarding causation. To prevail on a claim based on an erroneous jury instruction "it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional right]." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (internal citations and quotations omitted). The effect of an allegedly erroneous jury instruction on a conviction "must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 147 (1973) (citing Boyd v. United States, 271 U.S. 104, 107

(1926)).  The standard for relief based on a due process violation is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  Cupp, 414 U.S. at 148.  A state trial court's refusal to give a requested jury instruction does not, by itself, create a federal habeas corpus claim; a habeas petitioner must establish that the instructional error "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  The error must have resulted in "actual prejudice."  Id. at 637.

The Court finds no prejudice in the jury instruction. First, during the jury charge conference, the judge asked defense counsel and the State if they had any objection to the murder jury charge and both agreed that it was appropriate.  ECF No. 5-69 at 119-24.  Further, during the jury instruction itself, the judge explained that to find defendant guilty of murder, the State must prove each of three elements beyond a reasonable doubt, the first being: "[t]hat the defendant *caused* Alla Barney's death or serious bodily injury that then resulted in her death."  ECF No. 5-69 at 195 (emphasis added).  Similar instructions were given on the lesser included offenses of aggravated and reckless manslaughter.  ECF No. 5-70 at 3-7.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("[a] jury is

presumed to follow its instructions"). The judge did instruct the jury that they could only find Petitioner guilty if they found he caused the victim's death beyond a reasonable doubt; while it may have been helpful to further instruct the jury regarding causation, the Court does not find that the failure to do so had a substantial or injurious effect on the outcome of the case. Therefore, Petitioner has failed to show that he is entitled to relief on this claim.

**F. Ground Five: Jury Instruction on Inference**

Petitioner next argues that the trial court erred in instructing the jury that "[t]he use of a deadly weapon such as a knife in and of itself would permit you [the jury] to draw an inference that the defendant's purpose was to take life or cause serious bodily injury resulting in death." ECF No. 1 at 20. He explains that such an inference prevented the jury from considering defendant's alternative theory of the killing. Id.

Like the previous claim, Petitioner raised this claim in a supplemental *pro se* brief on direct appeal, ECF No. 5-14, and the Appellate Division affirmed on this ground without elaboration. ECF No. 5-16 at 10.

The alleged ailing instruction, in context, is as follows:

The use of a deadly weapon such as a knife

in and of itself would permit you to draw
an inference that the defendant's purpose
was to take life or cause serious bodily
injury resulting in death.  A deadly weapon
is a weapon, device, instrument, which in
the manner it is used or is intended to be
used is known to be capable of producing
death or serious bodily injury.

In your deliberations, members of the jury,
you may consider the weapon used and the
manner and circumstances of the killing.
And if you are satisfied beyond a reasonable
doubt that the defendant stabbed and killed
Alla Barney with a knife, you may draw an
inference from the weapon used, that is, the
knife, and from the manner and circumstances
of the killing as to his purpose or
knowledge.

. . .

I am now going to advise you about self-
defense.  The Indictment charges that the
defendant has committed the crime of murder.
The defendant contends that if the State
proves he used or threatened to use force
upon Alla Barney, that such force was
justifiably used for his self-protection.

. . .

ECF No. 15-69 at 197-98; ECF No. 5-70 at 8.

As explained earlier, a jury instruction must be viewed
in context of the overall charge.  Cupp, 414 U.S. at 147.  As
evidenced by the excerpt above, the trial judge explained that
the inference could only be drawn if the jury was satisfied
beyond a reasonable doubt that the defendant was the one who
stabbed the victim.  Understanding this in reverse, if the jury

was convinced by Petitioner's version of the story, that Alla fell on the knife accidentally, then the inference could not be drawn.  In that way, the Court does not find the alleged ailing instruction resulted in actual prejudice, because it was not required for the jury to draw the inference and did not preclude the jury from accepting Petitioner's version of the facts.  In addition, the judge instructed the jury on self-defense, passion/provocation manslaughter and other lesser included offenses, leaving the jury free to consider alternative versions of the factual scenario.  ECF No. 5-69 at 199–200; ECF No. 5-70 at 1–13.  Because the alleged violation does not violate clearly established federal law, this claim for habeas relief is denied.

### G. Ground Six: Evidence of Final Restraining Order

In Ground Six, Petitioner argues that the trial court erred in permitting the State to introduce evidence of a final restraining order against Petitioner, because it prejudiced the jury against him.  ECF No. 1 at 22.

The New Jersey Appellate Division, on direct appeal, reviewed this claim and affirmed without comment.  See ECF No. 5-16 at 10.

The record reflects that the trial judge heard from the State and defense counsel with respect to introducing evidence of the final restraining order, and the court found it met the

57

requirements under State v. Cofield, 605 A.2d 230 (1992) and

State v. Long, 801 N.J. 221 (2002), to be admitted as evidence

under the requirements of Cofield and as *res gestae* evidence

under Long. ECF No. 5-60 at 15-17. The trial court further

explained:

> Without the State's ability to introduce the
> events that occurred on September 29, 2003 to
> the jury, the jury would be left with an
> incomplete picture of the events leading to
> the victim's death. The State would be unable
> to explain the motive underlying this alleged
> act. The State would be hamstrung in its
> efforts to establish intent. The jury would
> be left with an incomplete and inaccurate
> version of the events that the defendant went
> to the daycare center to otherwise meet with
> his wife and an argument ensued that
> ultimately led to her demise. That would
> provide the jury with an inaccurate picture of
> the events as they unfolded on September 29,
> 2003.
>
> . . .
>
> [T]he murder of the victim here cannot be
> tried without evidence of the final
> restraining order. Without admitting this
> order at the trial of this case, the State
> cannot assert its theory that the issuance of
> the order provided the defendant with a motive
> to kill the victim.

ECF No. 5-60 at 21.

This claim fails to demonstrate a constitutional violation

of fundamental unfairness at trial. An erroneous evidentiary

ruling is not itself grounds for habeas relief. To rise to the

level of a constitutional violation, a state court's evidentiary decision must have been so arbitrary or prejudicial that it rendered the trial fundamentally unfair, thereby violating a petitioner's Due Process rights.  See Romano v. Oklahoma, 512 U.S. 1, 12–13 (1994); see also Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001) (evidentiary error rises to the level of a Due Process violation only when "it was of such magnitude as to undermine the fundamental fairness of the entire trial").  The United States Supreme Court has "defined the category of infractions that violate fundamental fairness very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990) (internal quotations omitted).

As evidenced by the excerpt above, the decision by the trial judge to permit evidence of the final custody order was not arbitrary or fundamentally unfair; it was necessary to provide the jury with an accurate picture of the events leading up to the Alla's death.  Furthermore, the trial judge found, under New Jersey state law, that the evidence could be admitted and it is not the job of a federal court to disturb state court rulings on issues of state law.  See Estelle, 502 U.S. at 67–68 (explaining that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law

questions"). Because Petitioner has failed to show that he is entitled to relief, this claim for habeas relief is denied.

**H. Ground Seven: Ineffective Assistance of Counsel**

In Petitioner's final ground for habeas relief, he argues his trial, appellate, and PCR counsels were ineffective for the reasons stated in Grounds One through Six. ECF No. 1 at 24. Because the underlying claims have already been addressed on the merits, counsel cannot be ineffective for failing to raise meritless claims. See, e.g., United States v. Mannino, 212 F.3d 835, 840 (3d Cir. 2000) (explaining, that if an underlying claim "is not meritorious . . . defendants can not successfully argue that counsel's failure to raise the claim on direct appeal denied them their constitutional right of representation"); Moore v. Mitchell, 708 F.3d 760, 776 (6th Cir. 2013) ("a petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit"); see also Moore v. United States, 934 F. Supp. 724, 731 (E.D. Va. 1996) ("Failure to raise a meritless argument can never amount to ineffective assistance"). Because a claim of ineffective assistance of counsel should not be used as an end run to present an otherwise meritless claim on a habeas petition, this Court will deny these claims for habeas relief.

## IV. CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003); see also Slack v. McDaniel, 529 U.S. 473, 484 (2000).

For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right as to Grounds Two through Six, above. Therefore, because jurists of reason could not disagree with this Court's resolution of those claims, the Court shall deny Petitioner a certificate of appealability on Grounds Two through Six. The Court will, however, grant a certificate of appealability on Ground One, on the issue of whether the state court unreasonably determined that Petitioner did not clearly and unequivocally assert his right to proceed *pro se*, because reasonable jurists could disagree as to the Court's resolution. The Court will, in

addition, grant a certificate of appealability on Ground Seven, only on the issue of ineffective assistance of counsel as it relates to Ground One, and will otherwise deny a certificate of appealability as to Ground Seven.

## V.   <u>CONCLUSION</u>

For the reasons stated above, the Petition for habeas relief is **DENIED** and Petitioner is **GRANTED** a limited certificate of appealability as set forth above.  An appropriate order follows.

Dated: <u>May 1, 2018</u>                        <u>s/ Noel L. Hillman</u>
                                        NOEL L. HILLMAN
                                        United States District Judge